## IN THE
## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| JANE DOE, | * | |
|     by her next friend, | | |
|     Sarah Rhine, Esq. | * | |
|     495 Fiddlers Green | | |
|     Dover, DE 19904, | * | |
| | | |
|         Plaintiff, | * | |
| | | |
|     v. | * | Civil Action No. WMN-14-3906 |
| | | |
| MARYLAND DEPARTMENT OF HEALTH | * | |
| AND MENTAL HYGIENE, | | |
| | * | |
|     201 West Preston Street | | |
|     Baltimore, MD 21201 | * | |
| | | |
| JOSHUA M. SHARFSTEIN, | * | |
|     In his official capacity as Secretary | | |
|     of the Maryland Department of | * | |
|     Health and Mental Hygiene, | | |
| | * | |
|     201 W. Preston Street | | |
|     Baltimore, MD 21201 | * | |
| | | |
| GAYLE M. JORDAN-RANDOLPH, | * | |
|     in her individual and official capacities, | | |
|     Deputy Secretary of | * | |
|     Behavioral Health and Disabilities | | |
|     Md. Department of Health and Mental Hygiene | | |
| | * | |
|     201 W. Preston Street | | |
|     Baltimore, MD 21201 | * | |
| | | |
| BRIAN HEPBURN, | * | |
|     in his individual and official capacities, | | |
|     Director, Behavioral Health Administration, | * | |
|     Md. Department of Health and Mental Hygiene | | |
| | * | |
|     Spring Grove Hospital Center | | |
|     55 Wade Avenue | * | |

Catonsville, MD 21228                                    *

MUHAMMED AJANAH,                                          *
    in his individual and official capacities,
    Acting Chief Executive Officer and Clinical              *
    Director, Clifton T. Perkins Hospital Center,
    Md. Department of Health and Mental Hygiene
                                                   *

    8450 Dorsey Run Road
    Jessup, MD 20794                                     *

LESLIE A. MCMILLAN,                                      *
    in her individual and official capacities,
    Director, Court-Involved Services Delivery,              *
    Secure Evaluation and Therapeutic
    Treatment Program                                       *
    Md. Department of Health and Mental Hygiene
                                                   *

    8450 Dorsey Run Road
    Jessup, MD 20794                                     *

DAVID O'NEAL,                                            *
    in his individual and official capacities,
    Director of Secure Evaluation and Treatment              *
    Program, Jessup
    Md Department of Health and Mental Hygiene               *

    8450 Dorsey Run Road                                 *
    Jessup, MD 20794
                                                   *

BARBARA ALLGOOD-HILL,
    in her individual and official capacities,               *
    Psychology Services Chief
    Secure Evaluation and Therapeutic Treatment              *
    Program
    Md. Department of Health and Mental Hygiene              *

    Springfield Hospital Center                          *
    6655 Sykesville Road
    Sykesville, MD 2178                                  *

SAEED SALEHINIA,                              *
    in his individual and official capacities,
    Neuropsychiatrist                        *
    Secure Evaluation and Treatment Program
    Md. Department of Health and Mental Hygiene *

    8450 Dorsey Run Road                     *
    Jessup, MD 20794

        Defendants.                   *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## COMPLAINT FOR
## INJUNCTIVE RELIEF AND MONEY DAMAGES
## WITH REQUEST FOR JURY TRIAL

Plaintiff Jane Doe, by and through her next friend Sarah Rhine and her undersigned

counsel, hereby sues Defendants the Maryland Department of Health and Mental Hygiene

("DHMH"), Joshua M. Sharfstein, Gayle M. Jordan-Randolph, Brian Hepburn, Muhammed

Ajanah, Leslie A. McMillan, David O'Neal, Barbara Allgood-Hill, and Saeed Salehinia for

damages to compensate her for the injuries she suffered from sexual assaults while in DHMH

custody, in violation of her rights under state and federal law and resulting from Defendants' acts

or omissions, and for injunctive relief to protect her from any further attacks and injuries.  For

this relief, she alleges as follows:

### NATURE OF CLAIMS

1.      Jane Doe was sexually assaulted repeatedly while in the custody of DHMH.  A

victim of sexual abuse while a child, Ms. Doe has significant mental health problems and

cognitive disabilities.  Ms. Doe was involuntarily committed, first to the Clifton T. Perkins

Hospital Center ("Perkins"), the state's maximum security hospital, and then to the State Secure

Evaluation and Therapeutic Treatment facility ("SETT").  DHMH at all times was aware of her

history of sexual abuse, mental health problems, and cognitive disabilities, yet it failed on two separate occasions to take the steps necessary to protect her from further sexual assaults.

2.     Jane Doe was committed to the care and custody of DHMH and placed at Perkins in the spring of 2011, where she was evaluated as not competent to stand trial. While at Perkins, and while under an order for constant 1:1 observation, Ms. Doe was sexually assaulted by a male patient on November 6, 2011. DHMH was aware of this assault.

3.     Jane Doe was subsequently discharged from Perkins, but, in October 2012 she again was involuntarily committed to the care and custody of DHMH, after having been evaluated as incompetent to stand trial. DHMH recommended that she be placed at the SETT facility, where she was the sole female resident.   Despite DHMH's knowledge of her clear vulnerability, the SETT facility did not take steps to protect Ms. Doe from assaults at the facility. As a result, in November 2012, Ms. Doe was sexually assaulted by a male resident of the facility.

4.     Both instances of sexual assault were perpetrated by men with assault histories: one who was charged at that time with multiple violent sexual assault offenses and the other facing charges of assault and willful transmission of HIV.

5.     As a consequence of these repeated attacks resulting from Defendants' failure to protect her from harm, Jane Doe was bruised and injured physically, was emotionally devastated, and became suicidal. These assaults occurred as the direct result of Defendants' repeated acts, omissions, and negligence and their unconstitutional failure to use professional judgment to provide appropriate protection and care as well as their reckless indifference to their duties to protect Ms. Doe from harm, including the failure to implement and follow proper procedures, and the failure to provide proper staff training and supervision while she was in DHMH custody.

Unless and until reforms are taken at these facilities to protect women patients, Ms. Doe will be at grave risk of further such attacks in the future. Plaintiff accordingly brings this action for injunctive relief and for compensation from Defendants for their acts and omissions resulting in her serious harm.

## JURISDICTION, VENUE, AND NOTICE TO THE STATE

6. This Court has jurisdiction over this civil action pursuant to Md. Code Ann., Cts. & Jud. Proc. § 1-501 (1998). The parties live in Maryland or conduct business in Maryland as an agency of the State of Maryland, and all acts and omissions of Defendants occurred in Maryland.

7. Venue is proper pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-201. DHMH is a State agency with main offices at 201 West Preston Street, Baltimore, Maryland 21201. It was the legal and physical custodian of Plaintiff when she was sexually assaulted at both Perkins and SETT, and it operates and controls both of those facilities. Defendants Sharfstein, Jordan-Randolph, Hepburn, Ajanah, McMillan, O'Neal, Allgood-Hill, and Salehinia are or were employees of DHMH.

8. Plaintiff timely notified the State of Maryland of these claims as required by the Maryland Tort Claims Act, Md. Code Ann., State Gov't § 12-107. First, by letter dated October 26, 2012, she timely filed a notice of a claim against the State with the Maryland State Treasurer based on her sexual assault while committed to DHMH and placed at Perkins. Second, by letter dated October 17, 2013, she timely filed a notice of a claim against the State with the Maryland State Treasurer based on her sexual assault while committed to DHMH and placed at SETT.

## PARTIES

9.    Plaintiff Jane Doe is twenty-five years old and a resident of the State of Maryland. At the times of the pertinent acts and omissions in question, she was committed to the care and custody of DHMH and placed in its facilities, first Perkins and then SETT.

10.    Sarah Rhine, acting as next friend for Jane Doe, is an attorney licensed to practice in Maryland and has known Ms. Doe for approximately three years. As a former staff attorney for the Homeless Persons Representation Project and the Maryland Disability Law Center, Ms. Rhine obtained extensive experience representing individuals with trauma histories and psychiatric and intellectual disabilities. In addition, Ms. Rhine has previously served as a court-appointed guardian for an individual with an intellectual disability. Ms. Rhine resides at 495 Fiddlers Green, Dover, Delaware.

11.    DHMH, through its agents and employees, including the individual Defendants in this case, has complete and ultimate authority for the operations at Perkins and SETT and is responsible for ensuring that DHMH's facilities comply with state law, regulation, and policy. DHMH and its agents are responsible for establishing regulations, policies, and practices at Perkins and SETT and for the development and modification of state facility policies, practices, and procedures. Among other things, DHMH is responsible for the training, hiring, retention, supervision, and conduct of Perkins and SETT employees and for their compliance with state or hospital policies, practices, and procedures. It is responsible for ensuring that staff at Perkins and SETT is sufficiently trained, for ensuring that patients receive appropriate care, and for ensuring that Perkins and SETT operate in a manner that provides protection from harm for

patients in its custody. Jane Doe was placed in the care and custody of DHMH and DHMH had a duty to protect Plaintiff from physical harm and psychological damage.

12.     Defendant Sharfstein is Secretary of DHMH. In this capacity, he is responsible for direction and operation of DHMH including its Perkins and SETT facilities and for policies and procedures at DHMH, including oversight of the development, implementation and compliance with the policies and procedures.

13.     Defendant Jordan-Randolph, as Deputy Secretary of Behavioral Health and Disabilities, provides direction to the Behavioral Health and Developmental Disabilities Administrations within DHMH. Her authority and responsibilities include oversight of the programs, including state-operated facilities, wherein individuals are housed upon being involuntarily committed to DHMH. She also is responsible for the forensic programs operated by DHMH. In February 2012, she also served as Interim Director for Forensic Services, where she had broad responsibility for the programs operated by DHMH serving individuals with mental health disabilities who were committed to DHMH by local state courts. From 2004 through approximately October 2012, she served as the clinical director for the Mental Hygiene Administration, where she was responsible for policy development and implementation of clinical practices meeting professional standards of care.

14.     Defendant Hepburn is Director of DHMH's Behavioral Health Administration. As such, he is responsible for ensuring that DHMH facilities serving individuals with mental health disabilities receive proper care and treatment. He is responsible for supervising the custody, care, and treatment of individuals who have mental health disabilities and are committed to the custody of DHMH.

15.     Defendant Ajanah is Clinical Director for Clifton Perkins Hospital and also was Acting CEO for Perkins during the time that Jane Doe was sexually abused at the facility. He has and had authority and responsibility for ensuring that individuals at Perkins receive proper care and treatment and protection from harm. Dr. Ajanah is and was responsible for ensuring that treatment plans and risk assessments meet professional standards of care. He also is and was responsible for ensuring that the facility complies with state policies regarding the investigation and reporting of sexual abuse.

16.     Defendant McMillan is Director of the Court-Involved Service Delivery System for the Developmental Disabilities Administration ("DDA") of DHMH. She previously served as Director of the Office of Forensic Services for the DDA. In both capacities, Ms. McMillan is responsible for the supervision of the forensic programs for persons with intellectual disabilities who are committed to DHMH and for the evaluations of such individuals by DHMH.

17.     Defendant O'Neal is Director of the SETT Jessup facility which houses persons with intellectual disabilities who are involuntarily committed to DHMH. He is responsible for ensuring the facility practices comply with adopted policies and that the program provides adequate protection from harm for all individuals committed to its care. He is responsible for ensuring that required evaluations, assessments, and treatment planning for individuals housed at the SETT are properly completed. He also is responsible for ensuring that reports of sexual abuse are investigated as provided for by state policy and that protective action is provided for all situations where there are allegations of abuse.

18.     Defendant Allgood-Hill is Clinical Director for the SETT facilities operated by DHMH. She is responsible for ensuring that appropriate services and treatment are provided to

all individuals who receive services in the SETT. Her responsibilities include ensuring that there is a treatment plan to address the well-being of individuals at the SETT. The plans of care must provide for clinically appropriate health care practices and include therapeutic interventions targeting sexual trauma for individuals for whom the need is identified through assessment or referral.

19.     Defendant Salehinia is a neuropsychiatrist at the Jessup SETT facility operated by DHMH. He is responsible for ensuring that appropriate services and treatment are provided to all of the patients he personally treats. His responsibilities include ensuring that there is a treatment plan to address the well-being of his patients at the SETT. The plans of care must provide for clinically appropriate health care practices and include therapeutic interventions targeting sexual trauma for individuals for whom the need is identified through assessment or referral.

## FACTS COMMON TO ALL COUNTS

### A.     Background.

20.     Jane Doe was sexually abused as a child. As DHMH knew, she has been diagnosed with both an intellectual disability and mental illnesses, including posttraumatic stress disorder. Assessments have consistently substantiated her disabilities over the years, and she had these diagnoses prior to being committed to the care and custody of the DHMH in 2011 and again in 2012.

21.     For example, the Kennedy-Krieger Institute assessed her intellectual and functional capacity in 2010 and concluded that Jane Doe has difficulty learning simple tasks, has very limited academic skills, and does not understand much of what is being said to her. The

assessment stated that, during the evaluation, "she often needed questions repeated or re-explained to her. When items were difficult, she would laugh to herself[.]" It concluded that she would require constant twenty-four hour supervision as an adult.

22.     The Kennedy-Krieger assessment was conducted to evaluate Jane Doe's skill level to plan for her transition from being a minor to an adult. She struggled with that transition and came into contact with the criminal justice system less than a year later.

23.     As a youth, Jane Doe had been in state custody and therefore had an established record of treatment and care protocols that were available to DHMH to use when Ms. Doe subsequently was committed to DHMH as an adult. For example, at one point when she was committed to state custody, she was placed in an out-of-state program as a minor. In 2010, in preparing for her transition to return to Maryland, DHMH prepared a thorough analysis of her history explaining the impact of her prior sexual abuse trauma and her post-traumatic stress disorder, detailing her current trauma symptoms (including nighttime fears, dissociative behaviors, and re-experiencing the sexual abuse acts), and warning against the use of restraints. Based on this analysis, and in consultation with her out of state program, DHMH developed a behavior plan that focused on helping her to cope with the trauma and feel safe. The analysis of her history and the transitional behavior plan were subsequently used to inform the competency evaluation that DHMH conducted in 2011 when she was committed to Perkins. Thus, DHMH had this information prior to committing her to Perkins and SETT, but failed to utilize it to protect her from harm and provide her with proper care at those facilities.

**B.     The Sexual Assault at Perkins.**

24.     Jane Doe faced charges for minor offenses in 2011 and, pending adjudication of her charges, was hospitalized at Perkins on April 27, 2011 to determine her competency to stand trial.  After it was determined that she was incompetent to stand trial, her commitment to Perkins by DHMH continued.

25.     Perkins' hospital policy requires staff to conduct risk assessments for patients to "provide a safe environment for all patients."  The policy requires the admitting physician to evaluate the patient on the basis of physical and mental vulnerabilities with particular regard to the possibility of abuse in the hospital. When there is an apparent risk of abuse, that need must be recorded in the patient's treatment plan and appropriate interventions must be noted in the medical record.  According to hospital policy, all staff must be aware of the risk of sexual abuse and to assess for such abuse on an ongoing basis.  Further, treatment teams are to take the issue into consideration in planning for treatment.

26.     Despite these policies, when Perkins staff filled out Jane Doe's initial psychiatric screening form on April 27, 2011, they did not assess the risk of abuse.  Indeed, the form does not provide for an evaluation of the patient's physical and mental vulnerabilities with regard to potential abuse in the hospital.  It does not even provide for collecting information related to prior abuse.

27.     The only reference to risk in Jane Doe's medical records is a hand-written note jotted on a page in her case file stating that she is at no imminent risk at the time of her evaluation.  But there is no indication that an actual screening for risk was performed as required

by policy, and, on information and belief, no such psychiatric screening was in fact conducted that conforms to professional standards of practice or the hospital's policies.

28. A social work assessment completed after the initial screening used forms eliciting information regarding the patient's history of physical and sexual abuse. In cooperating with the assessment, Jane Doe reported to Perkins staff that she had been both physically and sexually abused. She further disclosed that she does not like being left in a room alone and is aggressive because of her prior abuse. Despite the alarming nature of this self-reporting by Ms. Doe, and the high vulnerability and risk of potential harm it revealed, Perkins staff did not use this information gathered from Ms. Doe in the social work assessment as a basis for identifying interventions in her treatment plan or to update her risk assessment.

29. Perkins failed to use Jane Doe's mental health and social history, such as the Kennedy-Krieger Institute evaluation and the detailed behavioral plan developed by DHMH in 2010, in evaluating her and providing her with proper care. This omission violates professional standards of practice and the hospital's policies, and it contributed to the hospital's failure to provide Ms. Doe with adequate care, treatment, supervision, and protection.

30. While placed at Perkins, Jane Doe exhibited behaviors and reported issues regarding her past abuse that should have further alerted hospital staff to her high risk and vulnerability. Her medical records reported, among other things, that (i) she has paranoid thinking about men trying to break into her room, (ii) she is hyper-sexualized and takes off her clothes, (iii) she ran naked through the halls, and (iv) she is afraid at night and is concerned about men breaking into her room and being raped. Moreover, she had difficulty sleeping at night and could be agitated and aggressive, for which she was restrained, secluded, and medicated.

31.     Although her behaviors were observed and documented by treatment staff, Jane Doe's level of risk was not adjusted to reflect her vulnerability to victimization. Nor did her treatment plans significantly change to address her risk of abuse.

32.     Contrary to the treatment recommendations that had been developed in the past, which DHMH had access to but did not utilize, the Perkins staff used physical restraints and other inappropriate methods to address Jane Doe's emotional and behavioral issues stemming from her post-traumatic stress disorder. Even though DHMH had a duty to use prior treatment information to develop a plan to reduce the use of restraints, DHMH failed to do so and failed to use their own agency's behavioral plan which specifically stated that "ANY ATTEMPT TO PHYSICALLY RESTRAIN [JANE DOE] IS LIKELY TO INCREASE AGITATION EXPONENTIALLY!!!!"

33.     During this time and for much of her commitment to Perkins, staff had ordered that Jane Doe be monitored with "1:1 supervision." According to DHMH and Perkins' policies, a patient on 1:1 supervision must be monitored continuously by one staff person at all times. This order was not entered to protect Ms. Doe. Rather, it was entered because Ms. Doe had reacted aggressively when taunted by other patients for her mental disabilities (e.g., being called "retarded").

34.     DHMH and its agents knew or should have known that women committed to its facilities have disproportionately high rates of being sexually abused and that such women are at heightened risk of further abuse.

35.    In September 2010, just seven months prior to Plaintiff's admission to Perkins, a female patient at Perkins was physically assaulted and murdered by a male patient who had a history of allegations of violent offenses against women, including sexual offenses.

36.    Partly in response to the patient murder in 2010, in the spring of 2011, the Maryland legislature enacted requirements for DHMH's psychiatric facilities related to preventing, identifying, and reporting sexual abuse; training of staff; supporting alleged victims of sexual abuse at its facilities; and assessing a patient's risk of being a victim of sexual abuse. DHMH was responsible for ensuring that Perkins complied with this law, which came into effect on October 1, 2011, when Jane Doe was in its custody, over a month before she was assaulted.

37.    In September 2011, expert consultants retained by DHMH made several findings and recommendations related to Perkins, including, that staff at Perkins needed more trauma training; that staff feel unequipped to handle the current patient mix (including violent offenders and patients with cognitive disabilities); and that Perkins needed more appropriate clinical support and supervision.  The findings were included in a report addressing issues at all DHMH hospital facilities that DHMH submitted to the General Assembly on or about December 1, 2011.

38.    Despite the considerable public focus at this time on risks of violent injuries occurring at Perkins and similar facilities, on October 21 and 27, 2011, two patients at Perkins were beaten to death in separate incidents of patient-on-patient attacks.  Jane Doe's medical records confirm that she was fearful after the violent incidents.

39.    On November 6, 2011, only one to two weeks after these two patients were murdered, some patients, including Jane Doe, were escorted by staff to the gymnasium for

recreation. A Perkins employee was assigned to monitor Ms. Doe exclusively and continuously on that date, but he failed to do so.

40. Among the patients in the gymnasium on the morning of November 6 was an adult male patient who had been court-ordered to Perkins for competency and criminal responsibility evaluations following his arrest for violent sex offenses. Sometime after the events in question, he was found competent to stand trial, convicted on the sexual assault charges, and sentenced to life in prison (all but 12 years suspended).

41. The patient who sexually abused Jane Doe was known to Perkins staff to present a risk of harm, yet he was not properly supervised in the gymnasium.

42. The employee assigned to monitor Jane Doe continuously on a 1-on-1 basis did not supervise Ms. Doe while she was in the gymnasium.

43. Jane Doe and the male patient left the gymnasium and went into a bathroom where both patients were out of sight of any staff. The male patient assaulted Ms. Doe at this time.

44. After emerging from the bathroom and returning to the gymnasium, Jane Doe reported to staff that she and the male patient had sex in the bathroom.

45. DHMH and its agents failed to monitor and supervise the male patient properly to prevent him from sexually assaulting other patients.

46. DHMH and its agents failed to supervise properly the patient mix to protect Jane Doe from harm.

47.    DHMH and its agents failed to supervise properly the investigation of this sexual assault to ensure that it conformed to professional standards and did not result in further trauma to Jane Doe.

48.    Perkins staff conducted an investigation to determine whether the sex had occurred and, if so, whether it was consensual. The investigation heightened the emotional harm suffered by Jane Doe from her assault and was not conducted pursuant to professional standards. Before the State Police had an opportunity to get involved and conduct the investigation required by law, Ms. Doe had to endure multiple separate inappropriate interviews conducted by various male staff of Perkins, who repeatedly, and inappropriately, questioned Ms. Doe about whether she agreed to the sex, what had happened, and how she felt about it. Indeed, the State Police were not contacted by Perkins until five days after the incident.

49.    Jane Doe's treating psychiatrist later reported to the State Police that Ms. Doe has a history of being sexually abused, is cognitively incapable of consenting to sex, and is very vulnerable due to her trauma history. Perkins staff should have been aware of Ms. Doe's cognitive limitations and incapacity to consent to sex, and thus prior to contacting the State Police, should have limited their investigative activities to those that were necessary and proper.

50.    After Jane Doe reported the assault, Perkins arranged for an "on-call" psychiatrist to interview Ms. Doe. He was not her psychiatrist, was male, had no established relationship with her, and was not part of law enforcement. The psychiatrist interviewed Ms. Doe about her actions.

51.    Following this interview, Jane Doe was transported to Howard County General Hospital for a sexual assault examination. While she was in transit, a male security officer from

Perkins questioned her about the incident and whether she consented to the sex. These questions were inappropriate and contrary to established professional standards for treating a victim of sexual assault, particularly a victim with both a history of significant trauma from childhood sexual abuse and a limited mental capacity.

52. At Howard County General Hospital, Jane Doe was interviewed by a Sexual Assault Forensic Examination nurse. Ms. Doe told the nurse that she had been sexually assaulted. The examination documented that Ms. Doe had vaginal abrasions and a hematoma and that there was evidence of seminal fluid.

53. Security staff from Perkins took the physical evidence of the assault from the hospital but inexplicably failed to provide it to Maryland State Police at that time, again contrary to established policy and well-established professional standards.

54. Two days later, a Perkins security officer re-interviewed Ms. Doe and again asked about her desire to have sex.

55. On November 11, 2011, DHMH staff finally notified the Maryland State Police, which conducted its own investigation and interviews. The State Police concluded that there was reason to refer the case to the Office of the State's Attorney.

56. During the night following the incident, Jane Doe threatened and attempted suicide. She began to wrap a sheet around her neck, forcing hospital staff to intervene. She was placed on suicide precautions. Moreover, for several days following the sexual assault, Ms. Doe complained of pain and bleeding. She repeatedly showered, stating that she felt "ugly." Her inappropriate behavior increased and was noted by Perkins to be in reaction to her assault.

57.     Jane Doe's treatment team recognized that this sexual assault was a traumatic experience for her and arranged for a consultation on how best to address her behaviors. The consultant team concluded that she had sexualized behaviors that, among other things, served to reenact the trauma from her past and helped relieve her feelings of anxiety and/or depression. Behavioral modification strategies were developed and incorporated into her treatment plan.

58.     Jane Doe was discharged from Perkins in January 2012. Her discharge summary states that "[t]he patient has severe anxiety, due to a recent alleged sexual assault trauma by another patient. The patient complains of feeling dirty, requiring increased frequency of showers. She complains of vaginal pain, increased urinary urgency, depression, suicidal ideation, and she has some re-enactment behaviors consistent with posttraumatic stress." The summary further states that a physical exam confirmed sexual intercourse and that the patient appeared to have a change in her mental state following the sexual assault.

### C.     The Sexual Assault at DHMH's SETT Facility.

59.     In October 2012, Jane Doe was again committed to the care and custody of DHMH for purposes of competency assessments and treatment subsequent to allegations of minor offenses.

60.     Despite its prior knowledge of her vulnerability to sexual assault, DHMH placed Jane Doe at its Secure Evaluation and Therapeutic Treatment program in Jessup, Maryland ("SETT"), where she was the only female patient in the unit.

61.     DHMH operates the SETT program for individuals with developmental disabilities who require forensic evaluations and treatment as a result of their contact with the criminal justice system.

62.     The DHMH evaluation leading to Jane Doe's commitment to SETT failed to address or consider the recommendations of her discharge summary from Perkins although it noted her hospitalization at Perkins.  Ms. Doe's discharge summary at Perkins addressed her sexual abuse history and the sexual abuse at Perkins and her resulting injuries and need for trauma care.

63.     SETT staff had access to Jane Doe's records from Perkins and thus had access to the consultant team's conclusion that her behaviors were the product of her history as an abuse victim and should be addressed through behavior modification, not restraints.

64.     The Director of the Office of Forensic Services for the Developmental Disabilities Administration at DHMH coordinates the evaluation and admission of forensic patients and knew of Jane Doe's prior sexual abuse history.

65.     Upon her admission to SETT, Jane Doe was not provided with an appropriate, documented risk assessment.  On information and belief, either no such assessment was done or it was not adequate and appropriate and was not put into her medical record and case file.

66.     SETT's records also fail to contain any documented plan or intervention to focus on Jane Doe's obvious risk for abuse.

67.     At the time of Jane Doe's placements at Perkins and then at SETT, DHMH and its agents were aware that many of the women who were committed to DHMH custody had been victims of sexual assaults.

68.     At the time of Jane Doe's placement at SETT, DHMH and its agents were aware that numerous men committed to DHMH custody and placed at SETT have pending sexual assault or abuse charges against women.

69.     According to her SETT records, Jane Doe was placed under a standard "1:3 observation," meaning that she was one of three patients monitored by a single staff person. This was a less secure ratio than her previous 1:1 ratio at Perkins, where, even with such close supervision having been ordered, she was assaulted because the requisite supervision was not provided. Upon information and belief, the 1:3 staff to patient ratio is the staffing ratio normally provided at the SETT unit and does not reflect consideration of Ms. Doe's individual risks and circumstances.

70.     Within days of her admission to SETT, Jane Doe engaged in self-injurious behavior, such as head banging. She also had difficulty sleeping at night. Instead of following the post-assault behavior modification recommendations developed at Perkins and written into her treatment plan there, the SETT staff used interventions similar to those that Perkins had employed prior to the consultation, treating Ms. Doe by physical restraints, seclusion, and medication but not making any documented effort to identify the cause of these problems or to provide her with trauma-related care. SETT also failed to consider that restraints were specifically contraindicated by DHMH's prior behavioral plans developed for Ms. Doe in 2010.

71.     Instead of using pertinent information to provide Jane Doe with proper care and treatment, and instead of obtaining information about the patient to help minimize the need for restraints, both such actions being indicated by professional standards of care, SETT recommended that Jane Doe be subjected to multiple electric shock treatments.

72.     During the night of November 2, 2012, Jane Doe was heavily medicated to control her behaviors. The effect of the medicine was so severe that staff had to monitor her breathing.

73.     On November 3, 2012, staff found Jane Doe on the floor of a shower stall with a male patient having sex with her. Another male patient was stationed at the door of the shower room.

74.     The resident who sexually abused Plaintiff was committed to SETT for a forensic evaluation related to charges of assault and transmission of HIV. He is HIV-positive, and according to DHMH policies, "Individuals who have a sexually transmitted disease which may be life threatening will not be given the opportunity to be out of eye sight of a staff member with other residents. This is in order to ensure the health and safety of all residents."

75.     DHMH and its agents failed to monitor and supervise properly an extremely vulnerable patient who was committed to their care, and they further failed to monitor and supervise an extremely dangerous patient. Jane Doe was not supervised by any staff during the evening of November 3, 2012, even though the previous night she had to be heavily medicated to address her trauma-based symptoms and even though she was supposed to have 1:3 monitoring and supervision. As a result of DHMH's lack of monitoring and supervision, Jane Doe was sexually abused while in DHMH custody.

76.     Despite DHMH policy that HIV positive residents should have 1:1 supervision, DHMH failed to monitor and supervise properly the resident who sexually abused Jane Doe. It also failed to monitor and supervise the resident who stood guard at the bathroom door.

77.     DHMH failed to supervise properly the resident and patient mix to protect Jane Doe from harm.

78.     Once again, DHMH and its agents failed to supervise properly the investigation of this sexual assault to ensure that it conformed to professional standards and did not result in further trauma to Jane Doe.

79.     Upon seeing the assault of Jane Doe, SETT staff notified their internal security officers of the sexual contact. Much like the internal investigation done at Perkins, the SETT security officers focused the investigation on determining whether the sex act was consensual despite Ms. Doe's known limited mental capacities and history.

80.     The investigative process did not follow reasonable or professionally acceptable procedures for such investigations. For example, at the end of an interview by SETT security personnel, a security officer asked Jane Doe whether she had washed herself. When Ms. Doe reported that she had not, the officer instructed Ms. Doe to wash herself, thereby destroying critical case evidence.

81.     Jane Doe was not transported to the hospital for a Sexual Assault Forensic Examination.

82.     The SETT security officer responsible for investigating the incident determined that the sex was consensual despite Jane Doe's known limited mental capacities and history and despite the prior report by her treating psychiatrist at Perkins that Ms. Doe was incapable of consent.

83.     DHMH policies on sexual abuse define sexual abuse to include any sexual activity that occurs between individuals receiving services due to their cognitive limitations "unless the individuals are consenting adults with the cognitive ability to make a judgment."

Under that policy, which applies to SETT, DHMH facilities like SETT must report any incidents of sexual abuse to the Maryland State Police.

84. Upon information and belief, DHMH did not report the incident to the State Police until over a month later, when Jane Doe was transferred out of SETT and placed back at Perkins, where she complained to staff about her sexual assault.

85. Jane Doe was incapable of consenting to sex. Her history documents her intellectual functioning to be limited; her Full-Scale IQ score is variously reported as falling between 45 and 50. Her treating psychiatrist at DHMH's Perkins facility had concluded and documented that Ms. Doe was at risk for sexual abuse and unable to consent to sex. Indeed, a SETT psychiatrist concluded, after examining Ms. Doe on or about October 25, 2012 – one week before the assault had occurred – that Ms. Doe has a mental disability that so impairs her capacity to make decisions regarding her personal affairs, including health care, food, clothing, and shelter, that she meets Maryland's requirements for appointing a guardian for her.

86. Her doctors were aware of the sexual abuse incident but there is no record of a treatment team consult or intervention to either address the trauma of the incident or increase safety precautions to prevent a repeat assault. In fact, Plaintiff continued to be co-mingled with the residents involved in the abuse.

87. After the assault incident, Jane Doe's self-injurious behavior escalated. She had difficulty sleeping and suffered from nose bleeds, upset stomach, pain, vaginal discomfort, and bleeding. She expressed feeling lonely and being afraid to go to bed.

88. Jane Doe initially refused medication to prevent transmission of HIV because, she declared, she wanted to die. She later accepted the medication.

89.    On November 9, 2012, Jane Doe cried uncontrollably and started banging her head against the wall. She said that she wanted to die. Staff administered several chemical restraints, but Ms. Doe continued banging her head. She subsequently was transported to Howard County General Hospital for evaluation of a head injury.

90.    Despite the foregoing, a psychiatry note dated November 15, 2012 does not even mention Ms. Doe's sexual abuse incident. It lists several self-injurious or aggressive incidents between November 2 and 9 and notes crying spells, possible symptoms of somatization disorder, difficulties sleeping, and hyper-vigilance during the nights. Although the note emphasizes that Jane Doe has very limited judgment, which likely makes her a high-risk individual, it does not identify specific interventions to keep Ms. Doe safe from further sexual abuse. In fact, even after the abuse, SETT allowed Ms. Doe to have on-going contact with the individual involved with her abuse. She even continued to be housed near those individuals.

91.    On November 21, 2012, Jane Doe was transferred from SETT back to Perkins.

92.    After her discharge, SETT completed a "Risk and Therapy Needs Assessment" for Jane Doe. It notes her history of physical and sexual assault and her risky behaviors. While the assessment mentions specific incidents that occurred at SETT, including the head banging on November 9 that had prompted an emergency response, and advises that her disruptive behaviors tend to occur at night, it conspicuously and inexplicably fails to mention that Ms. Doe was sexually abused at the facility. Moreover, the assessment recommends "therapeutic intervention designed to address [Ms. Doe's] trauma history" as well as "psycho-social education on sexual relationships, self-esteem and appropriate boundaries," even though no such interventions or care

ever were developed for Ms. Doe's care, protection, and treatment while she was committed to DHMH and placed at SETT.

93. At the urging of the Maryland Disability Law Center, DHMH transferred Jane Doe back to Perkins, where she could be placed on an all-female unit, as she posed a risk to her own safety and the safety of others.

94. Perkins conducted a psychiatric screening of Jane Doe after she returned to the facility. Although the screening noted that she previously had been a patient at Perkins, it did not mention that she had been sexually assaulted at Perkins, nor did it mention the abuse at SETT, except to note that she had unprotected sex with an HIV-infected patient at SETT and therefore was being treated for possible HIV transmission. The only hint of a problem was a report that Jane Doe had become more agitated after the incident and needed intravenous medication.

95. Perkins' mis-assessment of Jane Doe's history and needs worsened when, on November 27, 2012, it developed an Individual Treatment Plan for Ms. Doe. This plan explicitly and unreservedly blamed Ms. Doe for her sexualized behavior and for the incident at SETT. It noted her "dangerous sexual behavior" and accused her of having made "false allegations of sexual assault (contradicted by records taken at SETT Unit prior to transfer here…)." Once again, the treatment plan failed to provide for any therapeutic intervention and behavior modification approach to address these issues. Remarkably, neither the detailed assessment of behavioral problems nor the behavioral modification strategies that the Perkins staff and consultants had developed in November 2011, after Ms. Doe was sexually assaulted at Perkins, were incorporated into the Individual Treatment Plan for Ms. Doe that the Perkins staff

developed one year later in November 2012. DHMH never looked to or incorporated the findings and behavior plan that it had previously developed in 2010 and which had been used to inform the competency evaluation conducted by DHMH in 2011. Thus, throughout her commitment to DHMH, the agency failed to use readily available information in Ms. Doe's medical history, including DHMH's own records on Ms. Doe, to provide her with the therapeutic treatment and interventions necessary to protect her from harm.

**D.**     **The Injuries to Jane Doe and Defendants' Wrongful Acts and Omissions.**

96.     As a result of Defendants' wrongful acts and omissions, Jane Doe was repeatedly sexually assaulted and abused while in DHMH's care and custody. She suffered extreme humiliation, fear, physical pain, and severe mental anguish from the assaults, and she was retraumatized by having been forced to relive the sexual abuse of her childhood. Ms. Doe continues to suffer from the trauma of the assaults and her emotional injuries therefrom.

97.     Defendants had a special relationship with Jane Doe and a duty to protect her from harm and to provide her with adequate and appropriate care and treatment.

98.     Defendants knew or should have known that victims of childhood sexual abuse such as Jane Doe are at significant risk of re-victimization.

99.     Defendants knew or should have known that Jane Doe was at risk for further victimization due to her documented abuse history, her trauma-related behaviors, her symptoms of mental illness, her cognitive limitations (which rendered her incapable of consenting to sex), and her placement into secure mixed-sex facilities housing men with histories of sexual abuse against women.

100.     Defendants repeatedly failed to prepare treatment plans for Jane Doe that recognized and addressed the fact that she is at risk of sexual assault and victimization, failed to consider and apply treatment approaches that had been developed previously to address her trauma-related disorders, failed to develop appropriate treatment approaches, and further failed to establish a training or treatment intervention, such as training or treatment to raise her awareness of sexual assault and its effects.    Instead, Defendants adopted and utilized inappropriate treatment approaches that had been rejected in prior assessments and evaluations.

101.     Defendants repeatedly failed to consider Jane Doe's past treatment and behavior history and therefore failed to prepare adequate and appropriate treatment plans that were designed to address her actual therapeutic needs.   Even after Ms. Doe was sexually assaulted at Perkins and again at SETT, Defendants failed to develop and implement adequate and appropriate treatment plans, using physical restraints and medication instead of behavior modification plans.

102.     Jane Doe was harmed by Defendants' failure to provide her with adequate treatment.

103.     Jane Doe was harmed by Defendants' repeated failures to respond appropriately to her allegations of sexual assault and abuse, including Defendants' failures to identify this sexual contact as abuse and to protect her from further harm.   She also experienced significant harm and trauma due to the wrongful manner in which DMHS' investigations were conducted.

104.     By failing to respond appropriately to Jane Doe's trauma history and her high risk of sexual assault and victimization, Defendants breached their duties to treat and protect Ms. Doe while she was in DHMH's care and custody.

105. Defendants lacked proper policies and failed to provide proper training to ensure adequate investigations of sexual assault allegations, especially regarding the issue of consent.

106. Defendants lacked proper policies and failed to provide proper training to ensure that its investigations of sexual assault allegations conform to trauma-informed care principles.

107. Defendants failed to provide its Perkins and SETT facilities with the necessary structure, supervision, and training to ensure the needed protection and care of Jane Doe.

108. Defendants failed to provide Jane Doe with adequate monitoring and supervision – at times providing her with no supervision and monitoring at all – to protect her from sexual assault.

109. Jane Doe has had a long history of hospitalizations, including over ten psychiatric hospitalizations. She currently is under court jurisdiction in several different counties in Maryland, where various orders have been put into place, a violation of any of which could result in her further commitment to a state facility. Ms. Doe therefore is at high risk of future placement in a DHMH facility such as Perkins or SETT.

110. DHMH's assessments of Jane Doe indicate that she is at significant risk of future institutional placements at DHMH facilities due to her risk for reoffending and/or her risk of harm to herself or others. Indeed, a recent DHMH evaluation recommended re-commitment to a DHMH facility.

111. DHMH has failed to cure the flawed policies, procedures, supervision, and other causes of the injuries that Jane Doe suffered in her placements at Perkins and SETT. Accordingly, she is at high risk of further injuries should she again be placed in a DHMH facility.

## CLAIMS FOR RELIEF

## Count One

### Negligence Relating to Injuries Suffered at Perkins
### (State Tort Claims Act)

### (against Maryland Department of Health and Mental Hygiene)

112.    Plaintiff Jane Doe repeats, realleges, and incorporates by reference each and every allegation of paragraphs 1-111 as if fully set forth herein.

113.    DHMH had a special duty to protect Jane Doe due to its custodial relationship with her and her involuntary commitment to its care and custody for placement at Perkins, a state psychiatric hospital. Under this special relationship, and pursuant to state law, DHMH owed Ms. Doe a duty to protect her from physical and mental harm while Ms. Doe was placed at Perkins, including sexual abuse and assault, and to provide her with adequate and appropriate care and treatment.

114.    DHMH violated its duty to protect Jane Doe from harm.

115.    DHMH violated its duty to provide Jane Doe with adequate and appropriate care.

116.    DHMH violated its duty to provide Jane Doe with adequate and appropriate treatment.

117.    DHMH violated its duty to investigate the sexual assault in an adequate and appropriate fashion, such that the trauma to Jane Doe would be minimized.

118.    DHMH knew or should have known that serious security concerns and patient safety issues existed at Perkins, including two very recent patient murders and a third murder within a year of the assault on Jane Doe.

119. DHMH knew or should have known that Perkins was having problems with staff supervision and training.

120. DHMH knew or should have known that it needed to take extra steps to bring Perkins into compliance with the new requirements of state law requiring protection of patients at state hospitals from the risk of sexual abuse or assault.

121. DHMH knew or should have known of risk of harm to patients like Jane Doe due to the fact that Perkins had patients who were victims of abuse alongside patients with abusive histories, and that Perkins' patient mix included patients with various serious mental health diagnoses alongside patients with co-occurring cognitive disabilities.

122. DHMH knew or should have known that the patient who sexually abused Jane Doe had pending criminal charges for violent sexual assault against women and that he could or did pose a risk of harm to Ms. Doe.

123. DHMH knew or should have known that Jane Doe, with her history of sexual trauma, sexualized behaviors, cognitive limitations, and mental illness, was at risk of harm from male patients with backgrounds of alleged sexual assault on women.

124. DHMH placed Jane Doe and the patient who abused her in a room together with inadequate supervision such that they left the room unsupervised and entered a facility bathroom where the male patient sexually assaulted Ms. Doe.

125. DHMH failed to provide Jane Doe with adequate and appropriate treatment and care that could have protected her from harm.

126. DHMH failed to provide Jane Doe with adequate and appropriate treatment and care following the assault for her to avoid further trauma and injury resulting from the abuse.

127. DHMH failed to investigate the sexual assault properly and appropriately, which caused her additional unnecessary trauma.

128. For these reasons, DHMH did not exercise reasonable diligence and customary care to ensure Jane Doe's protection and treatment. Specifically, DHMH breached its duty as provided herein by, among other things: (a) failing to provide adequate staff structure, supervision and training; (b) failing to provide adequate policies and security, including but not limited to keeping patients with abuse histories separate from patients with assault histories or allegations who present risk of assault; (c) failing to ensure proper policies and procedures for investigating allegations of sexual assault; and (d) failing to provide adequate risk assessment plans and updated treatment plans based on documented past assessments and treatment plans, including assessments and plans developed at other facilities.

129. DHMH's acts, omissions, and breached of duty caused substantial harm to Jane Doe. DHMH operated Perkins in a negligent manner and violated its duty of care by, *inter alia*, failing or refusing to adopt, implement, and enforce policies, practices and procedures that would have afforded Ms. Doe protection from harm and appropriate care and treatment.

WHEREFORE, Plaintiff seeks the following relief:

a. Enter judgment against DHMH and award compensatory damages in the amount of $200,000.

b. Enter an award of costs and attorney's fees, to the extent permitted by law, against DHMH and in favor of Plaintiff.

c. Provide such further relief as justice and the nature of this cause may require.

**Count Two**

**Negligence Relating to Injuries Suffered at SETT**
**(State Tort Claims Act)**

**(against Maryland Department of Health and Mental Hygiene)**

130.    Plaintiff Jane Doe repeats, re-alleges, and incorporates by reference each and every allegation of paragraphs 1-129 as if fully set forth herein.

131.    DHMH had a special duty to protect Jane Doe due to its custodial relationship with her and her involuntary commitment to its care and custody for placement at SETT, a state psychiatric facility for individuals with developmental disabilities.    Under this special relationship, and pursuant to state law, DHMH owed Ms. Doe a duty to protect her from physical and mental harm while Ms. Doe was placed at SETT, including sexual abuse and assault, and to provide her with adequate and appropriate care and treatment.

132.    DHMH violated its duty to protect Jane Doe from harm.

133.    DHMH violated its duty to provide Jane Doe with adequate and appropriate care.

134.    DHMH violated its duty to provide Jane Doe with adequate and appropriate treatment.

135.    DHMH violated its duty to investigate the sexual assault in an adequate and appropriate fashion, such that the trauma to Jane Doe would be minimized.

136.    DHMH knew or should have known that serious security concerns and patient safety issues could exist at SETT, in light of the documented problems that existed at Perkins, which housed a similar population.

137.    DHMH knew or should have known that SETT was having problems with staff supervision and training.

138.    DHMH knew or should have known that it needed to take extra steps to bring SETT into compliance with the requirements of state law requiring protection of patients at state hospitals from the risk of sexual abuse or assault.

139.    DHMH knew or should have known of risk of harm to patients like Jane Doe due to the facts that SETT had patients with abusive histories, Ms. Doe was the only female patient at SETT, and SETT's patient mix included patients with various serious mental health diagnoses alongside patients with co-occurring cognitive disabilities.

140.    DHMH knew or should have known that Jane Doe's assailant had pending criminal charges for assault and for transmission of HIV, that he could or did pose a risk of harm to Ms. Doe, and that he required constant, line-of-sight, 1:1 supervision per DHMH policies regarding patients with HIV.

141.    DHMH knew or should have known that Jane Doe, with her history of sexual trauma, sexualized behaviors, cognitive limitations, and mental illness, was at risk of harm from male patients with backgrounds of alleged sexual assault on women.

142.    DHMH knew or should have known that Jane Doe required constant one on one supervision at all times.

143.    DHMH left Jane Doe unsupervised such that she was sexually abused by one assailant while another male patient stood guard at the door.

144.    DHMH failed to provide Jane Doe with adequate and appropriate treatment and care that could have protected her from harm.

145.    DHMH failed to provide Jane Doe with adequate and appropriate treatment and care following the assault for her to avoid further trauma and injury resulting from the abuse.

146.    DHMH failed to investigate the sexual assault properly and appropriately, which caused her additional unnecessary trauma.

147.    DHMH intentionally failed to preserve the evidence of the sexual assault, which constitutes spoliation and should deprive DHMH of its right to defend against this claim under Maryland law.

148.    For these reasons, DHMH did not exercise reasonable diligence and customary care to ensure Jane Doe's protection and treatment.  Specifically, DHMH breached its duty as provided herein by, among other things: (a) failing to provide adequate staff structure, supervision and training; (b) failing to provide adequate policies and security, including but not limited to keeping patients with abuse histories separate from patients with assault histories or allegations who present risk of assault; (c) failing to ensure proper policies and procedures for investigating allegations of sexual assault; and (d) failing to provide adequate risk assessment plans and updated treatment plans based on documented past assessments and treatment plans (including assessments and plans developed at other facilities).

149.    DHMH's acts, omissions, and breaches of duty caused substantial harm to Jane Doe.  DHMH operated SETT in a negligent manner and violated its duty of care by, *inter alia*, failing or refusing to adopt, implement, and enforce policies, practices, and procedures that would have afforded Ms. Doe protection from harm and appropriate care and treatment.

WHEREFORE, Plaintiff seeks the following relief:

a.    Enter judgment against DHMH and award compensatory damages in the amount of $200,000.

b.     Enter an award of costs and attorney's fees, to the extent permitted by law, against

DHMH and in favor of Plaintiff.

c.     Provide such further relief as justice and the nature of this cause may require.

### Count Three

**Substantive Due Process:
Failure to Provide Constitutionally Required
Treatment and Protection from Harm
(14th Amendment, U.S. Constitution, 42 U.S.C. §§ 1983 & 1988,
and Article 24, Maryland Declaration of Rights)**

**(against All Defendants, Sued in Their Individual Capacities,
Except Sharfstein and the Maryland Department of Health and Mental Hygiene)**

150.     Plaintiff Jane Doe repeats, realleges, and incorporates by reference each and every

allegation of paragraphs 1-149 as if fully set forth herein.

151.     Jane Doe was involuntarily committed to the care and custody of DHMH, a state

agency, at all pertinent times when suffered the injuries described above.

152.     As a result of her involuntary commitment to the care and custody of DHMH,

Jane Doe was placed in two state-operated facilities, Perkins and SETT.

153.     As a result of Jane Doe's involuntary commitment to DHMH custody and

placement in state facilities, DHMH had a duty to protect Ms. Doe from harm and to provide

adequate and appropriate treatment for her mental and emotional disorders arising under the due

process provisions of the United States Constitution and the Maryland Declaration of Rights.

154.     Both the due process clause of the Fourteenth Amendment to the U.S.

Constitution and the due process right set forth in Article 24 of the Maryland Declaration of

Rights provide a right to liberty as a matter of substantive due process.  That right to liberty

includes the right to protection from harm and the right to adequate and appropriate treatment for

mental and emotional disorders when an individual is committed involuntarily to state custody and placed in a state mental hospital or institution. Specifically, Jane Doe had a constitutional right of liberty to be reasonably safe and free from harm and to receive necessary and appropriate treatment while in custody of the State and committed to a state hospital or institution for psychiatric care or assessment.

155. Due process also requires that DHMH provide adequate training to prevent a pattern of constitutional violations and to ensure, in this instance, that staff could and would provide Jane Doe with adequate supervision and protection.

156. Defendants Jordan-Randolph, Hepburn, Ajanah, McMillan, O'Neal, Allgood-Hill, and Salehinia violated Jane Doe's rights to liberty and deprived of her rights under the U.S. Constitution and the Maryland Declaration of Rights by failing to protect her from harm and failing to provide her with adequate and appropriate treatment.

157. Defendants Jordan-Randolph, Hepburn, Ajanah, McMillan, O'Neal, Allgood-Hill and Salehinia deprived Jane Doe of her constitutional rights by acting under color of state law.

158. Defendants Jordan-Randolph, Hepburn, and Ajanah were keenly aware that inadequate training and supervision at Perkins, as well as the failure to implement and act upon necessary policies, led to constitutional violations of patient's rights to be protected from harm. The lack of proper training and supervision led to three patient murders. First, in 2010 a known sex offender was charged with murdering a female patient who was involuntarily committed to Perkins. That patient had complained of being sexually abused at Perkins before her murder. As Defendants Jordan-Randolph, Hepburn, and Ajanah knew, the DHMH investigation concluded that a cause of this murder was staff's failure to properly monitor patients for safety and security.

Then, on October 21, 2011 a patient at Perkins was found dead in his room and another patient was charged with his murder. On October 27, 2011, a third patient was found dead in his room and a different patient was charged with the murder.

159. The need for adequate training and supervision was so obvious as to portend further serious patient-on-patient abuse, which is precisely what occurred.

160. Defendants Jordan-Randolph, Hepburn, and Ajanah were aware that Perkins had three different CEOs in a year and that the supervision, monitoring, and training at Perkins was in a state of disruption.

161. Defendants Jordan-Randolph, Hepburn, and Ajanah were aware that subsequent to the patient murders, staff at Perkins complained that they needed more training and reported concerns about the patient violence and monitoring of patients.

162. Defendants Jordan-Randolph and Ajanah spent numerous hours at Perkins prior to the sexual abuse of Jane Doe and were well aware of concerns of patients and staff regarding the lack of safety and security. Defendant Hepburn was also aware of the concerns of staff and patients regarding the lack of safety and security and pledged to provide more training and assessments of patients.

163. Despite the known risks of patient harm by Defendants Jordan-Randolph, Hepburn, and Ajanah, they failed to provide adequate protection for Jane Doe. Ms. Doe. received inadequate supervision and was left alone with another patient with a history of criminal charges of assaults and attacks on women. Defendants knew that patients posed a serious risk of harm to other patients but failed to provide adequate risk assessments and to ensure adequate supervision such that patients were protected from abuse by other patients. As a result of

Defendants Jordan-Randolph, Hepburn, and Ajanah's failure to provide adequate training and monitoring of and by staff, Ms. Doe received inadequate supervision which led to her being sexually abused.

164. Given the severe constitutional deprivations that occurred for patients prior to Jane Doe's assault, Defendants Jordan-Randolph, Hepburn and Ajanah acted with callous disregard or should have known that the failure to provide proper staff training and supervision would constitute a violation of Ms. Doe's right to be protected from harm.

165. While the three murders at Perkins provided definitive knowledge of the constitutional inadequacy of Perkins and its inability to protect patients from harm, Defendants Jordan-Randolph, Hepburn, and Ajanah also had statements from experts retained by DHMH informing them that staff training was needed and that staff did not know how to deal with the mix of patient population at Perkins.

166. Defendants Jordan-Randolph, Hepburn, and Ajanah knew that patients have a right to adequate treatment that comports with professional standards of care, and that failure to provide such treatment results in harm, including for victims of sexual abuse, increasing their risk of future and repeated sexual abuse.

167. Defendants Jordan-Randolph, Hepburn, and Ajanah were under notice and a duty to ensure that patients were assessed for risk of abuse, and that Perkins was failing to provide properly such assessments and related protections. Failure to remedy immediately such conditions constitutes a deliberate indifference to patient's rights to be protected from harm and demonstrated substantial disregard for professional standards of care such as to violate Jane Doe's constitutional right to adequate care.

168.     Defendants Jordan-Randolph, Hepburn, and Ajanah also were under notice and a duty to provide training for staff related to assessments for patients and providing patients with proper protection from sexual abuse as a result of legislation that required such action by DHMH.     Defendants Jordan-Randolph and Hepburn were present at legislative hearings regarding the need for increased training and protection of patients from sexual assault and were in favor of the legislation as it provided needed protections for patients.

169.     Defendants Jordan-Randolph, Hepburn, and Ajanah knew that staff at Perkins had responsibility to provide patient assessments and to monitor patients for safety and security but lacked adequate training and ability to provide for such assessments and security.     Defendants Jordan-Randolph, Hepburn, and Ajanah knew that there was a pattern of constitutional violations involving the inadequate assessment and supervision of patients which was known and not remedied leading to Jane Doe's abuse.

170.     Defendant Ajanah knew of Jane Doe's behavioral and abuse history and failed to reassess her treatment to provide proper care to protect her from risk of harm despite the known and obvious dangers at Perkins and law and policies requiring assessment of Ms. Doe's risk for abuse so as to provide her protection from harm.     Such actions exhibit a callous disregard for her rights.

171.     Defendants Jordan-Randolph, Hepburn, and Ajanah knew that proper investigations into complaints of sexual assault are required to protect patients from harm, including emotional trauma and protection from risk of future sexual abuses.     Despite this knowledge, Defendants failed to investigate properly Jane Doe's complaint of sexual abuse, causing her emotional injury and placing her at risk for future sexual abuse, which did in fact

occur. Such failure constitutes a substantial departure from professional standards as to constitute a reckless disregard for Ms. Doe's safety.

172. The failure of Defendants Jordan-Randolph, Hepburn and Ajanah to provide adequate security, training, and supervision at Perkins, especially in light of Jane Doe's history and in the context of a facility racked by failure to protect patients from harm, constitutes gross and deliberate indifference so as to violate Ms. Doe's constitutional right to treatment and protection from harm while in State custody and involuntarily placed in a State psychiatric hospital. Defendants Jordan-Randolph, Hepburn and Ajanah had knowledge that Perkins was a dangerous facility that presented obvious security and safety risks to patients, but did not act to protect Ms. Doe.

173. Defendants McMillan, O'Neal, Allgood-Hill, and Salehinia violated Jane Doe's rights to liberty and deprived of her rights under the U.S. Constitution and the Maryland Declaration of Rights by failing to protect her from harm, failing to provide her with adequate and appropriate treatment and failing to provide proper training and supervision necessary to protect her constitutional rights.

174. Defendants McMillian, O'Neal, Allgood-Hill, and Salehinia deprived Jane Doe of her constitutional rights by acting under color of state law.

175. Defendants McMillan, O'Neal, and Allgood-Hill failed to ensure that staff provided adequate supervision of patients at SETT so as to ensure Ms. Doe's protection from harm.

176. Defendants McMillan, O'Neal, Allgood-Hill, and Salehinia knew that Jane Doe was the only female at SETT and that other male residents had charges related to abuse, assault,

and violence against women. Their failure to ensure an assessment of Ms. Doe on admission and subsequent failures to develop a reasonable plan for proper supervision based on her needs was a substantial departure from professional judgment and care and caused to her to suffer serious harm. Their failure is especially egregious given her behaviors and demonstrable need for intervention. Rather than recognize her documented trauma and target behaviors, Defendants acted with gross indifference to her needs by failing to develop adequate plans to protect and treat her and provide her with adequate supervision.

177. Defendants McMillan, O'Neal, Allgood-Hill, and Salehinia knew that among the eleven other patients at SETT was an individual with criminal charges for assault and transmission of HIV. Despite this knowledge, and Jane Doe's history of sexual abuse and victimization, no appropriate training and supervision was provided to staff to ensure that Ms. Doe was protected from further sexual abuse to protect her from harm and the eventual sexual abuse that transpired. The failure to provide appropriate supervision of Ms. Doe was a gross violation of her right to be protected from harm. Defendants McMillian, O'Neal, Salehinia, and Allgood-Hill knew of Ms. Doe's history but failed to provide appropriate care, resulting in her serious harm.

178. Defendants McMillan, O'Neal, and Allgood-Hill knew or had a duty to know that Jane Doe had a history of sexual abuse and had been sexually abused at Perkins. Ms. Doe's sexual abuse history was detailed in numerous evaluations and reports, including her recent discharge summary from Perkins in 2012 and her DHMH records and behavioral plan from 2010. Defendants McMillan, O'Neal, and Allgood-Hill, were, however, deliberately indifferent to the risk of harm to Ms. Doe identified in those records and failed to protect her from harm.

179.  Defendants McMillan, O'Neal, and Allgood-Hill failed to provide or ensure provision of proper care and protection from harm by ignoring the fact that Jane Doe had a history of sexual abuse and had been sexually abused at another DHMH facility prior to being committed to SETT.  The failure to provide her with adequate supervision, given her behaviors and history, was a gross departure from professional standards of care and displayed deliberate indifference to her treatment needs and right to be protected from harm.

180.  Defendant McMillan had knowledge of Jane Doe's treatment as she had spoken with DDA service providers about Ms. Doe since at least 2010.  She coordinated the forensic evaluation ordered by the court in September 2012 and filed with the court in October 2012.  She received notice that Ms. Doe had sexual relations with a patient who was HIV positive the day after that incident.

181.  Defendant Salehinia was a member of Jane Doe's treatment team while she was committed to the care and custody of DHMH at Jessup SETT.  As a member of her treatment team, he prescribed and oversaw her medications, signed orders for physical and chemical restraints, kept progress notes, and was responsible for developing and directing therapeutic interventions.  He signed a physician's certification that she needed a guardian on account of her lack of capacity to consent to medication and ECT.  He also authored a psychiatric note that summarized her history by reviewing records from at least five separate healthcare providers who worked with Ms. Doe since 2010 and before her admission to Jessup SETT.  Among the records he reviewed were the detailed attachments to the 2011 forensic evaluation that contained the DHMH behavioral plan emphasizing avoidance of restraints and trauma-informed care.  Four days after her admission to Jessup SETT he requested ECT for Ms. Doe three times per week for

several weeks. The ECT was never conducted because she was transferred before the paperwork was processed. Dr. Salehinia authorized or prescribed restraints to be used on Ms. Doe on multiple occasions on November 4, the day after her sexual abuse and again a few days later. His records of use of the restraints fail to mention her sexual abuse.

182. Defendant Allgood-Hill was the co-evaluator on the Risk and Therapy Needs Assessment dated November 23, 2012 which was the only documented assessment of Jane Doe during her time at Jessup SETT, but which was produced after the assault and after Ms. Doe was transferred to Perkins. The November 23, 2011 assessment failed to identify the sexual abuse incident that had occurred a few weeks earlier.

183. Salehinia, O'Neal, McMillian, and Allgood-Hill were aware of the sexual abuse incident involving Jane Doe and another patient, yet they failed to protect Ms. Doe from further harm and permitted her to have continued contact with that patient, resulting in further sexual incidents between them.

184. Defendants McMillan, O'Neal, Allgood-Hill, and Salehinia failed to follow or ensure adherence to established practices and policies for investigating and reporting incidents of sexual abuse and responded to the sexual abuse in a manner deliberately indifferent to her care and that violates professional standards of care. Defendants failed to report or ensure that the sexual abuse was reported to mandated entities, failed to properly identify her sexual contact as sexual abuse, and failed to identify that the 'investigation' was wholly inadequate and violated standards of care. Defendants failed to take action so that Jane Doe would be taken to a sexual assault center or receive any trauma treatment. Defendants took no steps to address the focus of investigation which improperly focused on whether Ms. Doe desired to be on the shower floor

and abused.  Defendants took no steps to address the improper instruction to Ms. Doe that she should wash herself after the incident.  Subsequent to the investigation, which should have confirmed sexual abuse according to DHMH definitions and policies, no therapeutic interventions or treatment were provided to her (except for contraception and medication to prevent transmission of HIV), and, as a result, her mental health and behavior substantially deteriorated.

185.    Defendants McMillan, O'Neal, and Allgood-Hill ignored professional standards of care and DHMH policies and failed to maintain safe conditions of confinement for Jane Doe and failed to provide training necessary to secure her rights to be protected from harm.  Rather than recognize her documented trauma and target behaviors, Defendants acted with gross indifference to her needs by failing to develop adequate plans to protect and treat her and provide her with adequate supervision.

186.    Defendants McMillian, O'Neal, Salehinia, and Allgood-Hill ignored professional standards of care in turning a blind eye to her abuse and her previous treatment recommendations addressing her prior victimization and need for care related to her abuse.  In fact, Defendants' treatment responses, including increased use of restraints, were contraindicated and resulted in further harm to Jane Doe in violation of her right to receive adequate care and protection from harm.

187.    Defendants Jordan-Randolph, Hepburn, Ajanah, McMillan, O'Neal, and Allgood-Hill were deliberately indifferent to the treatment needs of patients who were victims of abuse.  Their failure to provide adequate and appropriate treatment for Jane Doe's trauma-based disorders and to address the new injuries resulting from the sexual assaults at Perkins and at

SETT, in light of Ms. Doe's known and established disorders and the evidence of acute trauma constitutes such gross and deliberate indifference as to violate Ms. Doe's constitutional right to treatment and protection from harm while in State custody and involuntarily placed in a State mental hospital or institution.

188.    Both the failure of Defendants to protect an extraordinarily vulnerable patient such as Jane Doe from harm and the failure to provide her with constitutionally required treatment despite her clear need shocks the conscience.

189.    Defendants Jordan-Randolph, Hepburn, Ajanah, McMillan, O'Neal, and Allgood-Hill knew that patients with histories of victimization from sexual abuse need treatment for that abuse and care to prevent re-victimization and further trauma.

190.    Defendants Jordan-Randolph, Hepburn, Ajanah, McMillan, O'Neal, and Allgood-Hill knew that investigation of sexual contact requires specialized approaches for persons with histories of sexual abuse and with mental health and other disabilities.

191.    Defendants' practices and policies, which all but ignored Plaintiff's trauma history and acute need for care and treatment, were a substantial departure from a professional standard of care and a gross disregard for the consequences.

192.    In neglecting these issues, risks, and clear needs, these Defendants substantially departed from accepted professional judgment such that they failed to reasonably exercise professional judgment.    Their acts and omissions were a gross departure from a reasonable standard of care.

193.    Defendants' acts and omissions resulted in Jane Doe suffering severe harm from which she became suicidal, suffered trauma, was physically and sexually abused, and was

emotionally devastated while she was involuntarily committed to their care in a secure state facility.

WHEREFORE, Plaintiff seeks a judgment that each named Defendant in this Court violated her constitutional rights to protection for harm and to adequate and appropriate treatment and seeks the following further relief:

     a.     Enter judgment against each named Defendant for this Count in his or her individual capacity and award Jane Doe compensatory damages in the amount of $3,000,000.

     b.     Enter an award of reasonable attorneys' fees and expenses for Plaintiff pursuant to 42 U.S.C. § 1988.

     c.     Provide such further relief as justice and the nature of this cause may require.

### Count Four

**Substantive Due Process:**
**Failure to Take Necessary Steps to Prevent Future Violations**
**of Constitutionally Required Treatment and Protection from Harm**
**(14th Amendment, U.S. Constitution, 42 U.S.C. §§ 1983 & 1988,**
**and Article 24, Maryland Declaration of Rights)**

**(against DHMH and All Defendants in Their Official Capacities)**

194.    Plaintiff Jane Doe repeats, realleges, and incorporates by reference each and every allegation of paragraphs 1-193 as if fully set forth herein.

195.    Despite their knowledge of the risks to patients like Jane Doe, Defendants have failed to take necessary steps to put into place policies, practices, training, and supervision necessary to prevent future sexual assaults from occurring at Perkins, SETT, or similar facilities.

196.    Despite their knowledge of the risks to patients like Jane Doe, Defendants have failed to take necessary steps to put into place policies, practices, training, and supervision

necessary to prevent future failures to provide adequate and appropriate care and treatment at Perkins, SETT, or similar facilities to patients suffering from trauma resulting from past and recent sexual assaults.

197.  Plaintiff Jane Doe is at extremely high risk of returning to Perkins, SETT, or a similar facility.

198.  Due to Defendants' failure to put into place the policies, practices, training, and supervision necessary to prevent these constitutional violations from occurring in the future, Plaintiff Jane Doe is at extremely high risk of being assaulted or failing to receive adequate or appropriate treatment.

199.  Injunctive relief is necessary to prevent DHMH's policies and practices that conflict with, violate, and are preempted by federal law, and to ensure that Defendants do not unlawfully fail to provide Plaintiff with adequate care and protection from harm when committed to their custody.

WHEREFORE, Plaintiff seeks an Order that

a.  Enjoins Defendants to develop and implement a remedial plan, subject to review by Plaintiff's attorneys and approval by this Court, that (i) requires staff training on how to incorporate evidence based patient risk assessments for being an abuse victim or abuser into patient treatment plans and requires incorporating specific trauma treatment interventions for patients with abuse histories in individual treatment plans, including updating such plans to address incidents of alleged abuse occurring in state facilities; (ii) identifies specific procedures and training for personnel identified to interview patients who report they have had sexual

contact with other patients, including training on the impact of trauma, proper

investigation techniques, procedures to avoid multiple interviews, and the use of

independent investigations; and (iii) ensures that DHMH timely and appropriately

shares information regarding patient's histories and risks for harm whenever

patients are committed to their care, regardless of the facility placement.

b.    Retains jurisdiction over this action until implementation of this Court's Order;

c.    Provides for reasonable attorneys' fee and expenses pursuant to 42 U.S.C. 1988;
and

d.    Provides such further relief as justice and the nature of this cause may require.

_____/s/_____
Mitchell Y. Mirviss
Stephen E. Marshall
Michael L. Hecht
Carl F. Ehrhardt
Kevin Cross
Venable LLP
750 E. Pratt St. Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)
semarshall@venable.com
mymirviss@venable.com
mlhecht@venable.com
cfehrhardt@venable.com
kacross@venable.com

_____/s/_____

Lauren Young
Laura Cain
Maryland Disability Law Center
1500 Union Ave, Suite 2000
Baltimore, MD 21211
(410) 727-6352
410-727-6389 (fax)
laureny@mdlclaw.org
laurac@mdlclaw.org

## **DEMAND FOR TRIAL BY JURY**

Plaintiff Jane Doe hereby demands a trial by jury for all such issues that are so triable.

_____/s/_____

Mitchell Y. Mirviss (Fed. Bar No. 05535)
Stephen E. Marshall (Fed. Bar No. 08896)
Michael L. Hecht (Fed. Bar No. 26174)
Carl F. Ehrhardt
Kevin Cross
Venable LLP
750 E. Pratt St. Suite 900
Baltimore, MD 21202
410-244-7400
410-244-7742 (fax)
semarshall@venable.com
mymirviss@venable.com
mlhecht@venable.com
cfehrhardt@venable.com
kacross@venable.com


_____/s/_____

Lauren Young
Laura Cain
Maryland Disability Law Center
1500 Union Ave, Suite 2000
Baltimore, MD 21211
(410) 727-6352
410-727-6389 (fax)
laureny@mdlclaw.org
laurac@mdlclaw.org

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 11th day of October 2016, a copy of the foregoing Complaint was filed with the Clerk of the Court using the CM/ECF system. The CM/ECF system sent a notification of electronic filing (NEF) to all attorneys registered to receive such notification in this case, including counsel for all Defendants.

/s/
_____
Mitchell Y. Mirviss
